1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

_____
)
9  DAVID KUMAR, *et al.*,                  )        No. C11-1082RSL
                                           )
10                   Plaintiffs,           )
                                           )        FINDINGS OF FACT AND
11         v.                              )        CONCLUSIONS OF LAW
                                           )
   WADE M. ENTEZAR, *et al.*,              )
12                                         )
                     Defendants.           )
13 _____)

14
15      This matter was heard by the Court commencing on May 13, 2014, and concluding on

16 May 14, 2014. Plaintiffs David Kumar and Quincy Development, LLC, seek to recover the

17 $1,000,000 they contributed to a real estate project in Grant County, Washington. The

18 contribution to Quincy 132, LLC, was made by plaintiff Quincy Development, LLC:  plaintiffs

19 therefore request that any judgment in their favor be entered in the name of that plaintiff. Dkt.

20 # 145 at 10. Plaintiffs have abandoned their claim for $100,000 associated with a tax dispute

21 with the Washington Department of Revenue.

22      Defendant Wade M. Entezar has asserted a breach of contract claim against plaintiffs

23 based on an alleged failure to contribute $2,000,000 of the $3,000,000 promised in the Quincy

24 132, LLC Agreement.

25
26

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

1

**FINDINGS OF FACT**

2    In 2005, Kumar and his wife sold property and invested in a speculative building project

3    involving a single home. When the builder they hired ran into difficulties, he introduced the

4    Kumars to Entezar and proposed that Entezar take over the project. The Kumars agreed and

5    hired Entezar to complete construction. The Kumars were impressed with the quality of

6    Entezar's work, and the project was completed in 2006. At some point, Entezar mentioned a real

7    estate development project in Quincy, WA, where Microsoft and other technology companies

8    were planning to build new server facilities. Entezar had a right to purchase property in Quincy

9    and had a number of pre-sale agreements in place.  Kumar found the project to be attractive and

10   decided to invest. In August 2006, Kumar and Entezar formed Quincy 132, LLC, through their

11   respective companies, Quincy Development, LLC, and defendant Quincy WC, LLC.

12   Pursuant to the Quincy 132, LLC, Agreement, both parties were required to make capital

13   contributions in the amount of $3,000,000. Although Kumar did not have $3,000,000 of his own

14   money to contribute to the enterprise, he negotiated a $2,000,000 loan from Sam & Jenny, Inc.,

15   to his LLC, Quincy Development. Combined with plaintiffs' $1,000,000, the loan allowed

16   plaintiffs to contribute the full $3,000,000 to Quincy 132. Defendants were aware that part of

17   plaintiffs' capital contribution was in the form of a loan and could have left the debt to the

18   borrower, in which case Sam & Jenny, Inc., would have pursued payment from Quincy

19   Development, LLC, when the development project failed. That defendants ultimately became

20   obligated on that loan (Entezar had to provide a personal guarantee to Sam & Jenny, Inc., in

21   order to obtain a line of credit to complete the project) does not change the fact that plaintiffs

22   contributed $3,000,000 to Quincy 132 at the outset, as required by the LLC Agreement.

23   Defendants, for their part, contributed a piece of property with a preliminary plat approval which

24   had an agreed value of $3,000,000. Thus, both parties satisfied their obligations under

25   Section 8.1 of the Quincy 132, LLC Agreement.

26   Pursuant to the LLC Agreement, Entezar was named the registered agent and sole

FINDINGS OF FACT AND
CONCLUSIONS OF LAW                    -2-

manager of Quincy 132, and as such was given the "authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business." Trial Ex. 1 at 4-5. Entezar was also granted the power and authority to "spend the capital and revenues of the Company in the furtherance of the business of the Company" and to engage in business ventures and activities apart from those of the Company, including such activities as may be deemed to be in competition with the Company. Trial Ex. 1 at 5. Any conflict of interest between the Company and Entezar's other interests was to be "resolved by the Manager using [his] reasonable best judgment consistent with the Manager's fiduciary responsibility to the Company." Id.

Notwithstanding the delegation of certain powers and duties to Carl Van Der Merwe, Entezar maintained managerial control over the activities of Quincy 132 throughout the relevant period. Entezar selected the businesses with which Quincy 132 contracted, issued and deposited funds on behalf of the Company, and maintained its books and accounts. Using his broad managerial powers, Entezar frequently moved money between and amongst his various companies and business partners: plaintiffs provided substantial evidence of disbursements from Quincy 132's accounts to Entezar, Van Der Merwe, Executive Building Products, Entezar Development Group EW, LLC ("EDEW"), Quincy WC II, LLC, Quincy WC III, LLC, and Spanish Castle, LLC. In a couple instances, Entezar used Company funds for purposes that were far removed from the business of the LLC. For example:

- On October 10, 2006, Entezar wrote a check, payable to himself, from Quincy 132, LLC that he used to make a down payment on a gas station in George, WA. Trial Exs. 125 and 126.

- On June 8, 2007, Entezar wired $623,000 from Quincy 132, LLC to Stewart Title of Coeur d'Alene to purchase a marina. Trial Ex. 176.

Based on the evidence of disbursements from Quincy 132, plaintiffs argue that Entezar

FINDINGS OF FACT AND
CONCLUSIONS OF LAW                          -3-

raided the Company for his own purposes, deprived it of funds, and ensured the project's failure. The inter-company transfers were not inexplicable, however, and have not been shown to violate the Quincy 132, LLC Agreement. Entezar was authorized to, and did, hire his own companies to do much of the work on the Quincy 132 project. That arrangement necessitated inter-company transfers of funds to pay for materials and services. Entezar's and Van Der Merwe's penchant for "borrowing" money from their various LLCs for their own purposes is more troubling, but there does not appear to be a contractual prohibition on the Company's ability to make loans. Plaintiffs' objection to this practice appears to be based on the lack of promissory notes or other formal evidence of indebtedness and/or the failure to pay back the amounts that were "borrowed," not on the lack of power to make loans in the first instance[1].

Despite the undocumented "loans," the Court finds by a preponderance of the evidence that Entezar was not a thief, but rather a terrible bookkeeper. Inter-company transactions occurred on a weekly, if not daily, basis without regard to the existence or maintenance of records that would tie the transfers to specific purchases, debts, or receipts. For example, Quincy 132 paid directly for cabinetry that EDEW purchased for the project "because [EDEW] did not have the funds at the time. Technically, [EDEW] is making this purchase." Trial Exs. 132 and 133. The lack of documentation does not make such transfers fraudulent, however. Entezar testified that, for the most part, monies borrowed from Quincy 132 were paid back and that expenditures were for materials purchased and/or services rendered. According to Entezar, any

---

[1] Plaintiffs have shown that Van Der Merwe created two fake lots in the development project to which he billed personal expenses related to the construction of his home and other projects.  Trial Ex. 76.  The evidence submitted shows that these charges were not "customary or incident to the management of the Company's business" and were not authorized by the LLC Agreement.  Trial Ex. 1 at 4-5.  Plaintiffs settled their claims against Van Der Merwe, however, and have not shown that Entezar is liable for Van Der Merwe's malfeasance.  Plaintiffs' reliance on an April 15, 2008, invoice from EDEW to Van Der Merwe (Trial Ex. 73) as evidence that Entezar approved the fake lot scheme is misplaced.  The invoice shows only that, once Entezar knew that Van Der Merwe had set up lots to hide personal expenses, he attempted to recover the improper charges.

FINDINGS OF FACT AND
CONCLUSIONS OF LAW                    -4-

1    unreimbursed loans were the result of oversight, not intentional wrongdoing, and were not

2    substantial. The Court finds this testimony credible despite defendant's inability to produce the

3    books of his various companies at trial (they had been seized by the government during an

4    investigation). There is evidence of deposits into the Quincy 132 accounts that offset many of

5    the expenditures and are inconsistent with plaintiffs' theory that defendants were raiding the

6    Company. See Trial Exs. 90, 95, 146, 152, 181, and 187.  In addition, there is evidence of site

7    work completed and homes built. See Trial Exs. 13 and 515.[2] Careful review of the many

8    documents produced reveals some evidence of basic accounting that supports Entezar's

9    testimony. When Quincy 132 was formed, for example, EDEW apparently fronted costs,

10   justifying an $8,993.17 transfer from Quincy 132 to EDEW soon after the Company was formed.

11   Trial Ex. 93. See also Trial Ex. 117 (reimbursement for building materials). In some instances,

12   Entezar's failure to keep accurate books may have actually worked in Quincy 132's favor. Trial

13   Exs. 56 and 57.

14        The Court is persuaded that Entezar acted in good faith, began and pursued the

15   development project with every intent of successfully building and selling 134 homes on the

16   Grant County property, and negotiated a release of plaintiffs' guarantee of the $2,000,000 loan

17   to Sam & Jenny, Inc., when failure became a very real possibility. Nevertheless, the Court has

18   no doubt that mistakes were made and that the inter-company transfers did not accurately track

19   Quincy 132's liabilities and assets. The evidence shows that funds were sent where they were

20   needed, generally in large, round numbers and often without explanation, receipts, loan

21   documents, or invoices. If every penny made it back into the correct accounts, it would be a

22

23        [2] Plaintiffs' insistence on looking only at the disbursements from Quincy 132's accounts has
     blinded them to the overall flow of funds and the value of the materials and services Entezar purchased

24   on behalf of Quincy 132. Using plaintiffs' $3,000,000 capital contribution and funds available from a
     line of credit, Quincy 132 completed substantial infrastructure for the development, began at least

25   twenty-five homes, and completed nineteen homes. Based on the budgeted cost of developing each
     house, the record shows that plaintiffs' cash contribution was used by Quincy 132 to obtain at least

26   $8,550,000 worth of materials and services under Entezar's management. Trial Ex. 35.

FINDINGS OF FACT AND
CONCLUSIONS OF LAW                           -5-

1   miracle. Based on the existing record, including information regarding the amount outstanding
2   on the line of credit and the budgeted costs associated with the construction, the Court finds that
3   defendants' lax accounting practices may have been responsible for as much as a $450,000 loss
4   of Quincy 132's funds.

5          That loss, however, is not what killed the Grant County project. As acknowledged by
6   both parties at trial, many of the assumptions on which the project was based fell apart following
7   the execution of the Quincy 132, LLC Agreement. The liquidity crisis related to the burst of the
8   housing bubble in the United States began in the summer of 2007, with most economists
9   agreeing that the economy was in recession by the end of that year. By the time the first
10  certificate of occupancy was obtained in late 2007, most of the would-be purchasers of the pre-
11  sold homes were unable to obtain financing or close the sales. At virtually the same time, the
12  State of Washington determined that a sales tax break for manufacturers would not apply to data
13  centers of the type that Microsoft and Yahoo.com intended to build in Grant County, causing
14  those companies to abandon their plans in the area. Thus, the customer base for which the houses
15  were being built never materialized, and the liquidity crisis made it very difficult for any
16  potential purchasers to obtain a mortgage. Being unable to sell more than a handful of houses or
17  to obtain additional financing to continue (or at least carry) the development, the parties decided
18  to get out of the project. Entezar packaged the development with additional assets to make it
19  attractive and assigned all of Quincy 132's assets and liabilities to a third party, Del Matthews of
20  Matthews Investments, in 2008. The collapse of the Quincy project was due to factors outside
21  the control of the parties, not defendants' failure to account for Quincy 132's funds. Plaintiffs'
22  $3,000,000 investment generated at least that amount of stock in homes: the fact that the
23  economy made it impossible to sell those homes cannot be laid at defendants' door.

24
25
26

FINDINGS OF FACT AND
CONCLUSIONS OF LAW                          -6-

**CONCLUSIONS OF LAW**

A. Plaintiffs' Breach of Fiduciary Duty Claim

Entezar owed statutory and contractual fiduciary duties to plaintiff Quincy Development, LLC. For purposes of this analysis, the Court is willing to assume that defendants' record-keeping failures rose to the level of gross negligence under RCW 25.15.155 and would therefore constitute a breach of statutory and contractual fiduciary obligations. Plaintiffs have not, however, shown that the breach of these duties "damaged Plaintiffs by hampering the ability of Quincy 132 to successfully complete the real estate development project." Dkt. # 145 at 7. The collapse of the real estate development project was not causally related to defendants' failures in record-keeping.

B. Plaintiffs' Breach of Contract Claim

In order to establish a breach of contract claim, a party must establish "the making and existence of a valid and enforceable contract between the parties; the right of the plaintiff and the obligation of the defendant thereunder; a violation of the contract by the defendant; and the amount of damages resulting to the plaintiff therefrom." Norm Adver., Inc. v. Monroe St. Lumber Co., 25 Wn.2d 391, 398 (1946). The Court assumes for purposes of this claim that defendants breached a provision of the Quincy 132, LLC Agreement by using Company funds for purposes that were not customary or incident to accomplishing the acquisition, development, construction, and sale of the subdivision. Nevertheless, plaintiffs have not shown by a preponderance of the evidence that they were damaged as a result of any misuse of funds.

C. Plaintiffs' Unjust Enrichment Claim

Three elements are required to establish a claim of unjust enrichment: (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value. Young v. Young, 164 Wn.2d 477, 484 (2008). "Unjust enrichment is the

method of recovery for the value of the benefit retained absent any contractual relationship because notions of fairness and justice require it." Id. In this case, both parties lost their entire investments in Quincy 132, LLC, and defendants put additional assets into the project in order to obtain releases for all parties. Plaintiffs have not shown that defendants "retained" any ill-gotten benefit after the project was assigned to Del Matthews. Based on the record presented, the Court would have to speculate regarding the status of any particular advance or loan as the project wound down. Plaintiffs have not, therefore, met their burden of proof on this claim.

D. Defendants' Breach of Contract Claim

Defendants have not shown that plaintiffs breached their promise to contribute $3,000,000 to capitalize Quincy 132, LLC. Their breach of contract claim therefore fails.

**CONCLUSION**

For all of the foregoing reasons, the parties' claims in the above-captioned matter are DISMISSED with prejudice.

Dated this 10th day of June, 2014.

_MrS Lasnik_
Robert S. Lasnik
United States District Judge

FINDINGS OF FACT AND
CONCLUSIONS OF LAW                    -6-